IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROMONT WADDY, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| RAYMOND LAWLER, et al., | : | NO. 08-286 |
| Respondents. | : | |

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                     October    29, 2008

Before the Court is the *pro se* petition of Romont Waddy ("Waddy" or "Petitioner") for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner challenges his state court conviction on the grounds that the prosecutor improperly used her peremptory challenges to exclude potential African-American jurors and that his counsel was ineffective in failing to properly raise or preserve potential claims concerning both allegedly improper comments made by the prosecutor during closing arguments and the trial court's rejection of a proposed curative jury instruction. For the reasons set forth below, we conclude that the claims raised fail on the merits and therefore **RECOMMEND** that the petition be **DENIED**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND[1]

---

[1]  In preparing this Report and Recommendation, we have considered Petitioner's Form Application for Habeas Corpus under 28 U.S.C. § 2254 ("Pet.") dated January 11, 2008 (Doc. No. 1) and the Response to Petition for Writ of Habeas Corpus ("Ans.") and accompanying exhibits filed on May 21, 2008 by the Philadelphia District Attorney's Office (Doc. No. 11). Although our scheduling Orders expressly gave Petitioner leave to file a reply brief (*see* Doc. Nos. 7 & 9), he did not do so.

We note that the following documents discussed in some detail in this Report are reproduced in the papers filed in this court and may be more easily located as follows: the Superior Court's July 31, 2003 opinion on Waddy's direct appeal (Ans. at Ex. A); the Common Pleas Court opinion dated September 26, 2002 following Waddy's appeal of the dismissal of his post-sentence motions (Ans. at Ex. B); and the Superior Court's February 8, 2007 opinion affirming the denial of Waddy's PCRA

The convictions giving rise to this petition pertain to the early morning robbery and killing of two employees of a Dollar Express store in Philadelphia on February 24, 2000.  The crime was the result of a conspiracy involving four men, one of whom was a former employee of the store.  The former employee, James Taylor, surrendered and ultimately pled guilty and testified on behalf of the Commonwealth at the joint trial of his three co-conspirators:  Petitioner, James Washington, and Willie Johnson.  The testimony at trial revealed that Taylor drew upon his knowledge of the store's operations and lack of security when it was first opened early in the morning to hatch a plan to rob its safe.  He spoke with Johnson, Washington, and Petitioner about the prospects of robbing the store on more than one occasion and they collectively devised the details of the plan, including who would drive to the store (Washington), who would remain in the car as a look-out (Taylor), and who would enter the store (Johnson and Petitioner).  They also determined that Johnson would carry a gun; Johnson and Petitioner also carried tools for use in opening the safe.  When they ultimately executed

---

petition (Ans. at Ex. C).

We have also consulted, as necessary, the state court record items received on May 8, 2008 from the Clerk of Quarter Sessions of the Philadelphia Court of Common Pleas ("St. Ct. Rec."). Unfortunately the file that was transmitted did not include any notes of testimony.  *See* Ltr. from Marc E. Gaillard, Second Deputy, to Michael Kunz, Chief Clerk, dated May 8, 2008 ("[W]e are delivering our entire file, there are no notes of testimony available.").  The file indicates, however, that 23 volumes of testimony were remanded to the Quarter Sessions office from the Superior Court on October 16, 2007 with the one part of the documentary file.  At our request, this Court's Clerk inquired again of the Quarter Sessions staff as to the status of the notes of testimony.  The Clerk was advised on October 8, 2008 again that the notes were "not available" and that they would be provided if they became "available."  As it appeared to us that the Quarter Sessions office misplaced the notes of testimony associated with this case, we directed the District Attorney to provide us with copies of the relevant volumes.  The following day, we unexpectedly received from the Quarter Sessions office six volumes of testimony, which, while far from a full set of proceedings, reduced somewhat the burden on the District Attorney to provide us with all of the necessary volumes.  We are appreciative of Respondents' efforts to copy from their files and provide us with pertinent notes of testimony and Petitioner's briefs to the Superior Court on direct appeal and post-conviction review, all of which were delivered to us on October 14, 2008.

2

their plan, Johnson killed the two employees present in the store with single shots to the head. During the subsequent police investigation, both Taylor and Petitioner gave statements describing how the foursome planned and executed the robbery and how the two victims came to be shot. In his interview with detectives, Petitioner initially identified Taylor and "another guy" as the ones who went into the store, but he ultimately admitted that he was the one who had accompanied the shooter in the store and that he had taken items from the store that he later re-sold. *See Commonwealth v. Waddy*, No. 0005-0781 1/2 at 2-5 (Phila. Ct. Comm. Pl. Sept. 26, 2002).

Petitioner, Johnson, and Washington were tried together in October and early November, 2001 by a jury sitting before the Honorable Steven R. Geroff of the Philadelphia County Court of Common Pleas. Jury selection consumed some twelve days, as the Commonwealth was seeking the death penalty as to Johnson. On the fifth day of jury selection, after four jurors had been seated, Petitioner's counsel, Daniel Greene, Esquire, objected that the prosecutor was employing the Commonwealth's peremptory challenges in a racially discriminatory manner. Judge Geroff suspended jury selection and explored the issue on the record at that time, requiring the prosecutor, Assistant District Attorney Judith Rubino, Esquire, to explain the basis for her rejection of eleven African-American venirepersons. At the conclusion of the hearing, Judge Geroff concluded that the prosecutor had not violated the prohibition against race-based jury selection. The parties proceeded with voir dire without further incident. The jury of twelve persons that was ultimately seated consisted of eight whites and four African Americans; of the four alternates, three were African American and one was white. *See Commonwealth v. Waddy*, No. 0005-0781 1/2 at 7-8 (Phila. Ct. Comm. Pl. Sept. 26, 2002). (Ans. at 10-12.)

The jury returned their verdicts on November 5, 2001. Petitioner was convicted of two

counts of second-degree murder, two counts of robbery, and criminal conspiracy.[2]   He was subsequently sentenced to two consecutive life sentences for the murders and a concurrent term of ten to twenty years imprisonment for conspiracy; the robbery convictions merged for sentencing purposes.  Still represented by Attorney Greene, Petitioner appealed to the Superior Court, which affirmed.  *See Commonwealth v. Waddy*, 832 A.2d 545 (Pa. Super. Ct. 2003) (table).   The Pennsylvania Supreme Court denied discretionary review on March 16, 2004.  *See Commonwealth v. Waddy*, 847 A.2d 1285 (Pa. 2004) (table).  (Pet. at 4-5; Ans. at 1-2.)

On or about June 28, 2004, Petitioner sought relief, *pro se*, under the Pennsylvania Post-Conviction Relief Act, 42 Pa. Cons. Stat. §§ 9541-46 ("PCRA").  Judge Geroff, to whom the PCRA matter was assigned, appointed counsel, who filed an amended petition raising claims of ineffective assistance of trial counsel for failing to object to certain comments made by the prosecutor at trial and for failing to preserve an issue concerning a curative instruction allegedly warranted by those comments.  The court denied and dismissed the PCRA petition on the merits, however, and the Superior Court affirmed.  *See Commonwealth v. Waddy*, 924 A.2d 699 (Pa. Super. Ct. 2007) (table). The Pennsylvania Supreme Court denied Waddy's petition for allowance of appeal on September 11, 2007.  *See Commonwealth v. Waddy*, 932 A.2d 76 (Pa. 2007) (table).

Petitioner initiated the present action on January 11, 2008.  (Pet. at 11.)[3]  The Philadelphia

---

[2]  Washington was convicted of the same charges.  Johnson was convicted of two counts of first-degree murder, two counts of robbery, criminal conspiracy, and possession of an instrument of crime.  (*See, generally,* Ans. at 2 & n.1.)

[3]  As Respondents recognize, pursuant to *Burns v. Morton*, 134 F.3d 109 (3d Cir. 1998), a *pro se* habeas petition from a prisoner is deemed filed as of the date it was delivered to prison officials for mailing to the court.  (*See* Ans. at 3 n.2.)  In that Waddy dated his signature to the petition as January 11, 2008, and in the absence of any evidence that he delivered his petition to prison officials for mailing at a later date, we will consider for these purposes that the petition received by this

District Attorney's Office filed its response on May 21, 2008, contending that the claims asserted in the petition lack merit and were properly rejected by the state courts.  (Ans. at 4.)

## II.      STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), in cases where the claim presented in a federal habeas petition was adjudicated on the merits in the state courts,[4] the petition shall not be granted unless the state court adjudication —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has made it clear that a habeas writ may issue under the "contrary to" clause of Section 2254(d)(1) only if the "state court applies a rule different from the governing rule set forth in [United States Supreme Court] cases or if [the state court] decides a case differently than [the United States Supreme Court has] done on a set of materially indistinguishable facts."  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  A writ may issue under the "unreasonable application" clause only where there has been a correct identification of a legal principle from the Supreme Court but the state

_____

Court's Clerk on January 16, 2008 was "filed" five days earlier.

[4] There appears to be no dispute in this case that the three claims raised in this habeas petition were fairly presented to the state courts for consideration and were adjudicated by the Superior Court on the merits.  Therefore, this AEDPA standard of review applies in this case.  *See, e.g.,* Ans. at 3-4 (asserting that claims are meritless and were reasonably rejected by the state courts); *id.* at 13 (*Batson* claim subject to deferential AEDPA standard of review; *id.* at 16 (first ineffectiveness claim subject to AEDPA standard); *id.* at 27 (noting where second ineffectiveness claim was determined by Superior Court).

5

court "unreasonably applies it to the facts of the particular case." *Id.* This requires the petitioner to demonstrate that the state court's analysis was "objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). In addition, this standard obligates the federal courts to presume that the "state courts know and follow the law" and precludes the federal court from determining the result of the case without according all proper deference to the state court's prior determinations. *Id.* at 24.

## III.   DISCUSSION

Waddy asserts that his convictions were obtained by action of a jury that was unconstitutionally selected and impaneled and that he was denied the effective assistance of counsel. (Pet. at 9, ¶¶ 12.A-C.) Respondents do not contend that the petition is untimely under the standards set forth at 28 U.S.C. § 2244(d) or that Petitioner failed to exhaust available state court relief as to any of the claims raised in this petition as required by 28 U.S.C. § 2254(b)(1). Our review of the record confirms that neither of these statutory provisions preclude consideration of his claims: the petition is timely brought and state court remedies have been exhausted. Therefore, we proceed to consider each of the grounds for relief raised by Waddy and assess the reasonableness of the state courts' application of federal law in denying relief on these claims.

### A.   Ground One: *Batson* Claim

Petitioner's first claim for relief concerns the jury selection process. He asserts that "after four days of jury selection [the prosecutor] used eleven (11) peremptory challenges striking ten (10) [A]frican-[A]merican prospective jurors," and that "the total ended up 11 out of 12 challenges used upon striking [A]frican-[A]merican prospective jurors." [sic] (Pet. at 9, ¶ 12.A.) Respondents contend that the prosecutor did not engage in purposeful discrimination during voir dire and that the state courts' rejection of Petitioner's claim that she did was not an unreasonable application of

federal constitutional law.  (Ans. at 9.)

The Supreme Court has made clear that prosecutors must not employ peremptory challenges to eliminate potential jurors on the basis of their race.  Pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), a three-step burden shifting analysis is employed to assess a claim that the prosecutor violated the Equal Protection Clause by exercising racially discriminatory peremptory challenges. At step one, "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Batson*, 476 U.S. at 96.  A petitioner may establish his prima facie case by showing that he is "a member of a cognizable racial group" and that the prosecutor exercised peremptory strikes against members of his racial group in the venire.  *Id.* (citation omitted).  The petitioner "must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.*  Once the petitioner makes a prima facie showing of racial discrimination, step two requires the state to articulate a race-neutral explanation for its use of peremptory challenges.  *Id.* at 97.  The prosecutor must "give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges."  *Id.* at 98 n.20 (quotation omitted).  If the state is able to come forward with race-neutral explanations for its peremptory strikes at step two, the trial court must determine, at step three, whether the defendant has established purposeful discrimination.  *Id.* at 98; *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (citing *Batson*, 476 U.S. at 98).  "The ultimate burden of persuasion regarding racial motivation rests with, and does not shift from, the [petitioner]." *Riley v. Taylor*, 277 F.3d 261, 275 (3d Cir. 2001) (en banc) (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)).

7

### 1.    The state court finding at step one

In Petitioner's case, the trial judge found a prima facie case of discrimination in light of the fact that "eleven out of twelve were members of the African-American race that were peremptorily struck." (N.T. 10/10/01 at 43.)  Respondents do not contest the propriety of that determination. (*See, e.g.,* Ans. at 10, 13-16.)

### 2.    The state court finding at step two

At the second step of the *Batson* analysis, the state court was to consider whether the prosecutor articulated race-neutral explanations for her peremptory strikes of African-American members of the venire.  The burden imposed by *Batson* at this stage requires the articulation of "a 'clear and reasonably specific' explanation of [the prosecutor's] 'legitimate reasons' for exercising the challenges." *Batson*, 476 U.S. at 98, n.20 (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)).  The burden of production on the Commonwealth at step two is not high; the Commonwealth need not produce "'an explanation that is persuasive, or even plausible.'  Rather, the sole issue at step two 'is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Hardcastle v. Horn*, 368 F.3d 246, 257 (3d Cir. 2004) (quoting *Purkett*, 514 U.S. at 768).

In his opinion explaining his determination on the issues of which Petitioner was complaining on appeal, Judge Geroff explained that he had "directed the prosecutor to state her reasons for striking each of the eleven jurors" and that she "then explained her reasons for striking each juror." *Commonwealth v. Waddy*, No. 0005-0781 1/2 at 8 (Phila. Ct. Comm. Pl. Sept. 26, 2002) (citing N.T. 10/10/01 at 43-51).  His opinion explained that he then "found that the reasons the

prosecutor gave for exercising the peremptory challenges were valid and were not motivated by race." *Id.* (citing N.T. 10/10/01 at 51).   Addressing the post-sentence motion that renewed the *Batson* challenge as to these eleven strikes, Judge Geroff stated in his opinion that "the trial judge is satisfied that the prosecutor had sufficient race-neutral reasons for each strike and that the defendant failed to demonstrate that the reasons were pretextual." *Id.* at 9.   Considering the *Batson* issue on appeal, the Superior Court simply stated that it found "no error in the [trial] court's explanation of its ruling." *Commonwealth v. Waddy*, No. 1762 EDA 2002 at 2 (Pa. Super. Ct. July 31, 2003).   Therefore, we consider the trial court to have found that the Commonwealth satisfied its burden at step two and construe the Superior Court to have adopted that finding.   We presume Petitioner to be challenging this finding, as well as the ultimate finding at step three.[5]

The prosecutor, ADA Rubino, testified in response to the *Batson* objection on the fifth day of voir dire that she exercised her peremptory strikes with respect to the following African-American venirepersons for the following reasons:

(1)   Patrice Robbins:  She "seemed very slow" to Ms. Rubino and had made errors answering the juror questionnaire.  (N.T. 10/10/01 at 47.)

(2)   Edward Robinson:  The prosecutor "did not think he was very intelligent."  Ms. Rubino also noted that "he seemed very happy with the defendants" and was wearing an earring.  (*Id.* at 47-

---

[5]   Waddy's *pro se* petition does not identify the particular phase of the *Batson* inquiry in which the state courts reached an allegedly unreasonable determination. We note, however, that on direct appeal, Petitioner's counseled post-trial filings suggested that he challenged the propriety of this step two finding. *See, e.g.*, Pl.'s "Boiler-Plate Post-Sentencing Motions," *Commonwealth v. Waddy*, No. 0781 1/2  May Term 2000, at 5 (Phila. Ct. Comm. Pl. Jan. 8, 2002) (contending that "in counsel's judgment the prosecutor was unable to come forward with a neutral explanation for those [peremptory] challenges"); Pl.'s Concise Stmt. of Matters Complained of Pursuant to R. 1925(b) of the Pa. R.A.P., at ¶ 2 (June 10, 2002) (arguing "the prosecutor was light years away from offering a neutral explanation for these challenges").  (St. Ct. Rec. Doc. Nos. D-2 & D-9.)

48.)

(3) Michael Williams: The prosecutor did not think that someone who was a substance abuse counselor and an assistant pastor would be a fair juror for the Commonwealth.  (*Id.* at 48.)

(4)  Marion Hardy: Ms. Rubino did not think that this venireperson would be a good juror given that  the police apparently attacked her son.  (*Id.* at 48-49.)

(5) Leslie Carter: The prosecutor thought she would not be a good juror given because her brother was convicted of gun possession.  (*Id.* at 49.)

(6)  Henry Boyd: Ms. Rubino thought that he was not a good juror because his brother was convicted of robbery and attempted murder and because the venireman had witnessed several shootings and did not volunteer to be a witness.  (*Id.*)

(7)  Steven Pruitt: The prosecutor did not think he was intelligent and noted that he was single and had a nine year old child.  (*Id.* at 50.)

(8) Barbara Brooker: This juror "knew" the housing project where the defendants resided.  (*Id.*)

(9) Cheryl Ford: The prosecutor noted that this juror worked in the Mayor's Office of Information and that her nephew was convicted of manslaughter.  Ms. Rubino also stated her impression that the juror "was rather pompous."  (*Id.*)

(10) Shawnda Southerland: Her father was convicted of bank robbery.  (*Id.* at 51.)[6]

(11) Miss St. Claire: This venireperson's employment with the pre-trial services division of

---

[6] The prosecutor later explained that Ms. Southerland's "father was convicted of bank robbery, her ex-boyfriend was stabbed to death.  She's been involved in the criminal justice system. . . .  This was a case where police took statements and I didn't think that she would be a good juror." (N.T. 5/20/02 at 44.)

the court in which the case was being tried involved interviewing defendants.  Her daughter had also been a fugitive on drug possession charges and the prosecutor felt that Miss St. Claire was inconsistent in her responses about her knowledge of the status of that case.  (*Id.* at 45, 51.)

Step two of the *Batson* analysis requires only that the state articulate a race-neutral explanation for its use of peremptory challenges.  The prosecutor provided the aforementioned bases for her strikes, and neither the trial judge nor counsel (either at the time of the challenge, at the hearing after sentencing, or in his appellate brief to the Pennsylvania Superior Court) identified any inaccuracies with respect to any of the objective criteria cited by the prosecutor (e.g., relation to someone with experience in the criminal justice system, particular type of employment, place of residence, etc.).  The state court's conclusion that the Commonwealth satisfied its burden of production in this regard is not unreasonable in light of the prosecutor's contemporaneous testimony, given on the fifth day of voir dire, regarding her reasons for striking these eleven African American venirepersons up to that point.  We agree that a finding of a *Batson* violation was not warranted at step two and that in order to establish that the prosecutor engaged in racial discrimination, Petitioner had to satisfy his burden of persuasion at step three of the analysis.

### 3.  The state court finding at step three

At step three, the trial court was to determine whether the defendant had shown purposeful discrimination.  At this step of the *Batson* analysis, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (*per curiam*).  The trial court is expected to evaluate the prosecutor's credibility concerning the basis for her strikes, assessing "whether the prosecutor's demeanor belies a discriminatory intent, [and] also whether the juror's demeanor can credibly be said to have exhibited

the basis for the strike attributed to the juror by the prosecutor." *Snyder v. Louisiana*, 128 S. Ct. 1203, 1208 (2008).  "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Id.* at 1207.  *See also* 28 U.S.C. § 2254(e)(1) (giving state court factual decision a presumption of correctness on federal habeas review absent clear and convincing evidence to the contrary). While "'a judge considering a *Batson* challenge is not required to comment explicitly on every piece of evidence in the record,' . . . 'some engagement with the evidence considered is necessary as part of step three of the *Batson* inquiry,' and this requires 'something more than a terse, abrupt comment that the prosecutor has satisfied *Batson*.'" *Hardcastle v. Horn*, 368 F.3d 246, 259 (3d Cir. 2004) (quoting *Riley v. Taylor*, 277 F.3d 261, 290-91 (3d Cir. 2001) (*en banc*)).

Here, the trial court solicited an explanation from the prosecutor for her reasons for exercising a peremptory strike as to the eleven African-American venirepersons struck through October 10, 2001.  Judge Geroff commented on some, but not all, of the persons; he did not permit commentary from Waddy's attorney as he went through the list with the prosecutor.[7]  In the interest of providing context, we recite the testimony that followed upon the trial court's finding of a prima facie case:

> MS. RUBINO: Judge, I would like to indicate for the record that we have four jurors picked, there are two white and two black jurors.  So of the four, half of them are black jurors that have already been selected by both sides.

---

[7] When Waddy's attorney first raised his *Batson* objection, he sought to "provide at this time reasons why be believe there has been racial discrimination" and began to address the first juror stricken by the prosecution and the responses she gave to questioning.  (N.T. 10/10/01 at 40-41.) The prosecutor objected that it was not proper for defense counsel to speculate as to her reasons for striking the jurors (*id.* at 41-43), and the trial court agreed that "the burden is entirely on the Commonwealth, if I believe there's a prima facie showing."  (*Id.* at 43.)

(N.T. 10/10/01 at 43.)  Following argument by the prosecutor that the defense had used thirteen of

its collective sixteen strikes on white jurors as of that point, and a bit of a repartee as to whether the

prosecutor had standing to raise a *Batson* objection as to Attorney Greene's exercise of his

peremptory challenges, the hearing continued:

> MS. RUBINO: Judge, which jurors would you like my reasons on?  Would you like it on the last juror.
>
> THE COURT: Let's go to the last juror.
>
> MS. RUBINO: She works for pretrial services, she's a case manager, her daughter has been arrested for drug possession and was a fugitive.  She didn't remember anything at all about that incident which seemed to me not to be very sincere since she said to the Court that she didn't go to court and then it turned out she did go to court with her daughter.
>
> THE COURT: I have no problem with that one, Mr. Greene. It seemed quite obvious she was either misleading us or trying to conceal certain information.  I have no problem with that one.
>
> MR. GREENE: *Do you want me to run through the others and the reasons why I believe —*
>
> THE COURT: *No, I'm not going to require that.*
>
> MS. RUBINO: I would note for the record that two of the three defense counsel also had agreed to strike her and Mr. Greene did not agree but all three of us though tthat she was not an acceptable juror.
>
> MR. GREENE: That's just the last one, there were ten others, Your Honor.
>
> THE COURT: Let's go off the record.
>
> (Whereupon a discussion was held off the record.)
>
> THE COURT: Miss Rubino, please go through the strikes one by one and tell us the race neutral reasons if you can.
>
> MS. RUBINO: Number 16, was my first strike.  The juror seemed very slow to me.
>
> MR. GREENE: That's October the 3rd.
>
> MS. RUBINO [sic]: What was her name?
>
> MR. GREENE: Her name was Patrice Robbins.
>
> MS. RUBINO: Am I being asked or is counsel being asked?
>
> THE COURT: I asked Mr. Greene.
>
> She seemed very slow to you, go ahead, next.
>
> MS. RUBINO: And had made errors on the sheet in answering the questions on the sheet.

The next juror was white.  My next strike was number 18 —

MR. GREENE: That was on October 4th, Edward Robinson, Your Honor.

MS. RUBINO: I did not think he was very intelligent, he seemed very happy with the defendants to me.  He was wearing an earring and I did not think that he would be a good juror for the Commonwealth, did not think he was very smart.

THE COURT: Next one.

MR. GREENE: *You don't want me to respond?*

THE COURT: *No, I'm not asking for a response, Mr. Greene, I don't think it's necessary.*

MS. RUBINO: Number 23, on the same day was a reverend—

MR. GREENE: Michael Williams, Your Honor.

MS. RUBINO: He was a substance abuse counselor, a reverend.  This is a capital case, he's an assistant pastor and I did not think that he would be a fair juror from our standpoint.

THE COURT: Next one.

MS. RUBINO: Number 31 —

MR. GREENE: Wait a minute, October 5th, Marion Hardy, number 23.

MS. RUBINO: The police attacked her son.

THE COURT: I remember that.  You can move on to the next one.

MS. RUBINO: Number 31, Leslie Carter.

MR. GREENE: That's correct.

MS. RUBINO: Brother was charged with possession of a gun, is in jail, had witnessed five — I'm sorry, brother was convicted of gun possession and I did not think that she would be a good juror given that situation.

MR. GREENE: *Again you don't want my response, correct?*

THE COURT: *I do not.*  Next.

MS. RUBINO: Number 3 —

MR. GREENE: That's on October the 9th, You Honor.

MS. RUBINO: Henry Boyd, brother was convicted of robbery, attempted murder, witnessed five shootings didn't tell anybody, didn't volunteer to be a witness, thought that there were enough other people.  I certainly did not think that he was a good juror.

Number five Steven Pruitt, I did not think he was intelligent, he was single and he had a nine year old.

THE COURT; We don't hold that against anybody, do we?

MS. RUBINO: Well it's not my preference as a juror.

Number 19, Barbara Brooker, she knows Hill Creek, which is

14

where the defendants all reside.

      THE COURT: You mentioned that in questioning her.
You may move on from her.

      MS. RUBINO: Number 23 —

      MR. GREENE: Cheryl Ford.

      MS. RUBINO: Works in the Mayor's Office of Information,
nephew was convicted of manslaughter, I thought she was rather
pompous.

      THE COURT: You may move on from her.

      MS. RUBINO: Number 25, her father was convicted of bank
robbery.

      THE COURT: Put a name with the number.

      MR. GREENE: Shawnda Southerland.

      MS. RUBINO: Shawnda Southerland the one with the long
curls.

      THE COURT: I remember her, father was convicted of bank
robbery.

      MS. RUBINO: Right, and then the last one was number four
with the daughter with the drug possession and pretrial services but
had no recollection of that stuff.  That's the list.

      MR. GREENE: *My objection is on the record.*

      THE COURT: I'm satisfied these are race neutral peremptory
challenges exercised by the Assistant District Attorney.

      MR. GREENE: *Please note my exception on the record.*

(N.T. 10/10/01 at 45-52 (emphasis added).)

      The *Batson* issue was renewed on post-sentence motions.  Waddy's attorney reviewed the

record from October 10, 2001 as to the African-American venirepersons struck, reciting the reasons

given by the prosecutor.  He compared her reasons to his own sense of the suitability of the

individuals, drawing upon their responses from voir dire.  Although the post-sentence hearing

provided the opportunity that he did not apparently have during voir dire, counsel did not identify

any factual inaccuracy in the reasons given by the prosecutor for her strikes when compared against

their actual testimony, nor did he point to any white venirepersons who were accepted by the

prosecution despite sharing characteristics of the stricken African-American jurors.[8]  (N.T. 5/20/02 at 9-35.)  He argued that some of the African-American persons were asked "meaningless" questions or almost no questions by the prosecutor, intimating that that evidenced that the strike was based upon an improper reason.  (*Id.* at 11-13, 19, 24.)  Both Waddy's attorney and the prosecutor then provided their arguments.  The prosecutor pointed to the fact that one-third of the jury that was ultimately seated was African-American and that the first juror that was seated was African-American — both of which belied any improper motivation by the prosecution.  (*Id.* at 42-43.)  She also further explained that her position generally is that persons "who have relatives who have been convicted of crimes, who are presently in jail or who have had relatives that they say were attacked by the police" do not make good jurors for the Commonwealth.  (*Id*. at 43.)  She also explained that "in some cases we don't want people who live in the same area where the defendants are," since at that point not all of the defense witnesses are known to the prosecutor and it is possible that the prospective juror would know defense witnesses.  (*Id.*)  She asserted that, as to every strike, the prospective jurors were stricken "because of their background or the way in which they answered some of the questions."  (*Id.* at 43-44.)

As Attorney Greene went through the record from October 10th during the post-sentence hearing held some seven months later, Judge Geroff offered some comments reflecting his

---

[8] Rather, he only pointed out that the one white juror stricken by the prosecutor up until that point was intelligent, perhaps suggesting that the prosecutor's concerns about the lack of intelligence of some of the African-American jurors was disingenuous.  (N.T. 5/20/02 at 9-10.)  The prosecutor did not respond to that point when given an opportunity later in the hearing to address the court.  (*Id.* at 42-44.)  In light of the prosecutor's accusation that defense was improperly striking white jurors, Attorney Greene was also prepared to explain the reasons why he struck certain white jurors up to that point, but the court explained that that was unnecessary, as his strikes were irrelevant to the *Batson* challenges to the prosecutor's conduct.  (*Id.* at 36.)

impression of the validity of the reasons given by the prosecutor for her strikes.  For example, with respect to Ms. Hardy, Judge Geroff heard Attorney Greene's argument as to why he thought "[i]n [his] judgment there was nothing objectionable about this lady" but then offered the following reading of the record:

> THE COURT: I'm looking at Ms. Rubino's race neutral response and that was the police as to Marion Hardy, the police attacked her son.  At that point I interrupted and said I remember that, I can move on to the next one.  Apparently I was satisfied immediately that there was no need to consider any more than that.
> MR. GREENE: I repeat, in response to your question she indicated to me and to I believe the Commonwealth that she would be fair.
> THE COURT: Commonwealth is not bound to accept every answer that is north of the fence, every answer that a person gives.

(N.T. 5/20/02 at 17-18.)  Attorney Greene reiterated that in his judgment the reason for the strike was racially motivated and then moved on.  (*Id.* at 18.)  In discussing another challenge, to the striking of Barbara Brooker, Waddy's counsel similarly reviewed her response to the voir dire questions and offered "[his] thinking that Barbara Brooker was peremptorily struck as a possible juror in this case based on racial considerations."  (*Id.* at 26-27.)  Judge Geroff responded:

> THE COURT: Okay.  At Page 50 on October 10 Ms. Rubino said: "Number 19, Barbara Brooker, she knows Hill Creek, which is where the defendants all reside."
> I then interrupted and said: "You mentioned that in questioning her.  You may move on from her."
> So apparently I was satisfied immediately that that was [sic] sufficient race neutral reason for her being struck.

(*Id.* at 27.)  Similarly, after hearing Attorney Greene's argument about the propriety of Cheryl Ford as a juror and his belief that she was struck for racial reasons, Judge Geroff responded as follows:

> THE COURT: All right.  Again on October 10th's record, Pages 50 to 51, Ms. Rubino responded as follows to Cheryl Ford's

17

being struck: "Works in the Mayor's Office of Information, nephew was convicted of manslaughter. I thought she was rather pompous."

At that point again I interrupted and said you may move on from her. Obviously I agreed that the race neutral reasons were appropriate.

(*Id.* at 29.)

We have reviewed the responses given by these eleven African-American venirepersons against whom ADA Rubino exercised peremptory challenges on or before October 10, 2001. To the extent the prosecutor cited particular responses they gave, her recitation of their responses is supported by the record. Further, the bases given — that a close family member had been convicted of a crime or had a negative encounter with the police, that the individual was familiar with the defendants' neighborhood, or that a pastor/counselor might be reluctant to impose the death penalty — do not strike us as illegitimate.[9] Obviously, the cold record does not allow for an assessment of

---

[9] Having reviewed the voir dire proceedings in their entirety, we saw consistency in the prosecutor's approach to persons with close family members convicted of crimes — a reason that factored into the prosecutor's strike of many of the African-American venirepersons concerned in the *Batson* challenge raised by Waddy's counsel on October 10, 2001. *See, e.g,* N.T. 10/15/01 at 148-62. One venireperson who did *not* present that background was Michael Williams. He was objected to because he was a substance abuse counselor and a pastor. (N.T. 10/10/01 at 48.) Waddy failed to point to any other "evidence" that this strike was based on race besides Attorney Greene's belief; he did not even attempt to point to any non-African-American comparators. While we are not aware of any other known substance abuse counselors or reverends who were examined prior to the *Batson* challenge, we note that the prosecutor subsequently exercised a peremptory challenge with respect to someone whom Attorney Greene identified in his voir dire questioning as "Caucasian" and who, in response to questions about any beliefs that would prevent him from returning a first degree murder verdict in an appropriate case, volunteered that he also served as a pastor. *See* N.T. 10/10/01 at 112, 116, 118.

The circumstances of another strike initially raised some question in our mind. The prosecutor stated that she struck Barbara Brooker because "she knows Hill Creek, which is where the defendants all reside." (N.T. 10/10/01 at 50.) Judge Geroff correctly remembered that the prosecutor had asked Ms. Brooker about this, specifically, whether she had "become familiar with an area called Hill Creek" during a period of prior employment about which she had testified. (N.T. 10/9/01 at 100.) However, while Ms. Brooker acknowledged that the store in which she was

(continued...)

intangibles, such as whether someone objectively appeared "slow" or to be hiding something  or sympathetic to the defendants, although we could discern some reason for concern about the "intelligence" of certain persons based on somewhat conflicting or confused responses given to questioning.  *See, e.g.,* N.T. 10/4/01 at 139-42 (Edward Robinson).  However, the court best suited to assess whether the prosecutor's strikes reflected a discriminatory intent was Judge Geroff, and we have the benefit of his consideration of this ultimate *Batson* issue made while the incidents were still fresh — on the fifth day of jury selection.  We see no reason to doubt that the trial court evaluated the prosecutor's credibility concerning the basis for her strikes by assessing "whether the prosecutor's demeanor belies a discriminatory intent, [and] also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder v. Louisiana*, 128 S. Ct. 1203, 1208 (2008).[10]  We certainly do not see clear error in the trial

─────────────────

[9](...continued)
employed for nine years was located in the Hill Creek neighborhood, *she had not worked there in over ten years*. *See id.*  She also denied knowing any of the defendants who were sitting before her or the witnesses who had been identified by name.  The risk that a defense witness would testify at trial who would be known to this juror — the reason given for this strike by the prosecutor at the post-sentence hearing (N.T. 5/20/02 at 43) — was, objectively, probably quite remote.  However, we cannot characterize the prosecutor's different sense of the danger of this witness hearing testimony from someone with whom she might be familiar to be "implausible or fantastic" such that it should have struck Judge Geroff as merely a pretext for purposeful discrimination.  Obviously he found the prosecutor credible on this point.  We are not prepared to conclude that Waddy has demonstrated that there was clear and convincing evidence requiring a contrary conclusion.

[10] We were somewhat concerned that the court did not permit defense counsel, at the time of the *Batson* challenge on October 10, 2001, to respond to the prosecutor's stated reasons for the strikes.  However, counsel was given a full opportunity in that regard at the post-sentence hearing on May 20, 2002, at which point he had the benefit of a transcribed record of the voir dire proceedings.  The basis for counsel's argument at the later hearing was essentially that he deemed these persons to be suitable jurors and that because the prosecutor held a different opinion she must have been acting pursuant to a discriminatory intent.  Given that Waddy did not present any evidence undercutting the factual basis for the race-neutral reasons given by the prosecutor and did not present
(continued...)

court's ruling on the issue of discriminatory intent; therefore, it must be sustained.  *See id.* at 1207.

*See also* 28 U.S.C. § 2254(e)(1) (giving state court factual decision a presumption of correctness on

federal habeas review absent clear and convincing evidence to the contrary).

The ultimate burden of persuasion regarding racial motivation rests with Petitioner.  *See Riley*

*v. Taylor*, 277 F.3d 261, 275 (3d Cir. 2001) (en banc) (citing *Purkett v. Elem*, 514 U.S. 765, 768

(1995) (per curiam)).  He did not meet that burden.  Therefore, the Superior Court's rejection of

Waddy's claim that he was convicted by a jury that was selected and impaneled in an

unconstitutional manner was not unreasonable and this claim on habeas review should not give rise

to relief.

**B.    Ground Two: Ineffectiveness in Failing to Preserve Claim Regarding Prosecutor's Closing Argument**

Petitioner's second claim for relief concerns the alleged denial of effective assistance of

counsel.  He asserts that "[t]rial counsel[,] who also served as appellate counsel[,] failed to raise and

preserve the issue of improper comments made by the prosecutor during closing arguments."  (Pet.

at 9, ¶ 12.B.)[11]  Respondents contend that the Superior Court's decision — that the comments about

which Petitioner complains were not improper and therefore that counsel cannot be ineffective for

---

[10](...continued)
any similarly-situated white venirepersons who were deemed acceptable to the Commonwealth, there was little "evidence" (aside, perhaps, from the numerics) with which Judge Geroff needed to "engage."  Therefore, we are satisfied that Judge Geroff adequately discharged his responsibilities in resolving the *Batson* challenge.

[11] In the absence of any further explanation from Petitioner about the specific comments that he finds objectionable, Respondents presume that he is challenging here the same two comments challenged in the Superior Court on PCRA review.  (*See* Ans. at 16 n.3.)  Given that Petitioner has not objected to this characterization, and given that a claim based on any other comment would be procedurally defaulted, we will do likewise.

failing to object to them or raise an issue on appeal — did not constitute an unreasonable application of federal constitutional law.  (Ans. at 16, 19.)

We begin with a review of the applicable federal standards implicated by this claim.

### 1.    Legal standards

In *Strickland v. Washington*, 466 U.S. 668 (1994), the Supreme Court set forth a two-prong test that a petitioner must satisfy before a court will find that counsel did not provide effective assistance consistent with the Sixth Amendment.  Under this test, a petitioner must show: (1) that his attorney's representation fell well below an objective standard of reasonableness; and (2) that there exists a reasonable probability that, absent counsel's errors, the result of the proceeding would have been different.  466 U.S. at 688-96.

To satisfy the first prong of the *Strickland* test, a petitioner must show that "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  In evaluating counsel's performance, a reviewing court should be "highly deferential" and must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  Moreover, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant [or petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).  To satisfy the second prong of the *Strickland* test, a petitioner must show that there is a reasonable probability that, were it not for counsel's errors, the outcome of the proceeding would have been different.  *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the

proceeding.  *Id.*  Counsel cannot be ineffective for failing to pursue meritless claims or objections. *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999).

With respect to concerns of prosecutorial misconduct, we note that Fourteenth Amendment due process clause is violated where remarks made by a prosecutor "so infected the entire trial as to make the resulting conviction a violation of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).  When we assess whether a federal due process violation occurred, the allegedly improper remarks must be considered in the context of the entirety of the trial, not in isolation.  *Id.* at 179.  Therefore, a reviewing court must weigh the severity of any misconduct by the prosecutor, the effect of any curative instruction, and the quantum of evidence against the petitioner.  *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001). "[T]he stronger the evidence against the defendant, the more likely that improper arguments or conduct have not rendered the trial unfair, whereas prosecutorial misconduct is more likely to violate due process when evidence is weaker."  *Marshall v. Hendricks*, 307 F.3d 36, 69 (3d Cir. 2002).

### 2.    First comment to which objection was not made ("a trial is not a search for truth")

Petitioner contended before the Superior Court on PCRA review that his attorney should have objected to a comment made by the prosecutor in her closing that a trial is not a search for the truth. *See Commonwealth v. Waddy*, No. 3196 EDA 2005 at 5 (Pa. Super. Ct. Feb. 8, 2007) (identifying the statements petitioner identified as "improper comments" to which counsel did not object).  As did the Superior Court, we consider the context of the complained-of comment, particularly the comments of the various attorneys involved in the case regarding "the search for truth" and the function of a trial.

The prosecutor advised the newly-seated jurors in her opening comments that, during the trial, they would be hearing from witnesses and would ultimately need to assess whether or not "they're telling the truth," just as they do in their daily lives, asking themselves "does what [the witnesses] say have the ring of truth or does that person seem to be trying to be evasive and not answering the questions." *Commonwealth v. Waddy*, No. 3196 EDA 2005 at 5 (Pa. Super. Ct. Feb. 8, 2007) (quoting N.T. 10/23/01 at 35-36). In *his* opening statement, Attorney Greene took the issue of "truth" further:

> [The prosecutor] at one point in her opening statement talked about the ring of truth, the search for truth. In a sense, ladies and gentlemen, that is an oversimplification because **we are not really involved in a search for truth**. Let me put it this way[.] [H]ow many of you have ever seen the Statue of Justice, a tall beautiful statuesque woman with a scale draped over her shoulders. But interestingly this beautiful woman, the Statute of Justice has a blindfold over her eyes, so she is not actually involved in a search, because search requires the use of sensory perception, your eyes. No, you know what she does, she's not involved in a search, she's involved in weighing, evaluating, analyzing.

*Id.* at 5-6 (quoting N.T. 10/23/01 at 78-89 and adding emphasis and alterations) (footnote omitted). The subject of "truth" came up again in closing arguments, when counsel for one of Waddy's co-defendants contended:

> Ladies and gentlemen, what is a trial all about[?] **A trial is a search for the truth**. You have witnesses who come into this courtroom, they put their hands on this Bible, and they swear to tell the truth, and you, good ladies and gentlemen, you are the ones who must decide whether or not they are telling the truth or who is telling the truth and who is not telling the truth. That's how you make your determination as to whether any criminal defendant is guilty or not guilty.

*Id.* at 6 (quoting N.T. 10/31/01 at 66 and adding emphasis and alterations).

The prosecutor had the opportunity to give her closing argument following the speeches of

the three attorneys representing the three defendants, which had included an accusation from Attorney Greene that she "does not have a functional north on her compass." *Id.* at 7 n.5 (quoting N.T. 11/1/01 at 57-58). Her closing included the following:

> And as we said to you in our openings, that's why it was a particularly long jury selection, because we knew it was going to be a difficult case and we did want jurors who would be able to use your common sense. That's why we have juries and not judges deciding every case because we want your common sense. We want you to use those brains that you were given and that's why each and every one of you were selected.
>
> Ladies and gentlemen, the trial, **any trial is not a search for the truth**. If it were a search for the truth then counsel wouldn't try to get people off who were guilty, and they wouldn't try to get them off, but that is their job as defense counsel and they're not looking for the truth. They're looking for an acquittal. **So don't let anybody fool you that a trial is a search for the truth, because it is not**.

*Id.* at 7-8 (quoting N.T. 11/1/01 at 61-62 and adding emphasis). Petitioner contended on PCRA review that the statement expressed the prosecutor's personal belief as to the guilt of Petitioner or that it was designed to inflame the passions of the jury. *Id.* at 8 (quoting arguments raised in Appellant's Brief). He also argued that the prosecutor was "'in effect stating that only guilty people are placed on trial, the inference being that [Petitioner] would not be on trial if he were not guilty and it is defense counsel's job to fool the jury.'" *Id.* (quoting page 20 of Appellant's Brief). While defense counsel later sought an instruction related to these issues, he did not make a timely objection to this part of the closing or request a mistrial on this basis. Brief for Appellant, *Commonwealth v. Waddy*, Pa. Super. Ct. No. 3196 EDA 2005 at 20 (July 26, 2006) (citing N.T. 11/1/01 at 61-62, 103).[12]

---

[12] A copy of Waddy's counseled brief to the Superior Court on PCRA review was provided
(continued...)

The Superior Court observed that a prosecutor may fairly respond to points made in the defense closing and that the propriety of ADA Rubino's conduct must be examined within the context of defense counsel's conduct. *Commonwealth v. Waddy*, No. 3196 EDA 2005 at 8 (Pa. Super. Ct. Feb. 8, 2007). The court concluded that "the prosecutor demonstrated poor judgment by making a statement that was inappropriate and generally disparaging to defense counsel, whose charge it is to protect the rights of the accused, not to 'get off' people who are guilty." *Id.* at 9. The Superior Court also specifically admonished the prosecutor to refrain from such comments in the future. *Id.* at 9 n.6. While the court found her remarks were "ill-chosen" and that they "came dangerously close" to constituting prosecutorial misconduct, it concluded that the comments "were not so egregious" as to rise to that level. *Id.* at 9 & n.6. It also determined that the statements did not have an adverse effect on the outcome of the proceedings given the evidence presented at trial. *Id.* at 9. In light of the fact that a new trial would not have been warranted based on the prosecutor's comments, the Superior Court agreed that there was no basis for trial counsel to object to the closing or to raise on appeal an issue concerning the statements. *Id.*

We share the Superior Court's assessment that the prosecutor's theme in this part of her closing argument reflected poor judgment and expressed a cynical view of the jury trial process. We agree that her comments came dangerously close to expressing her personal assessment that the defendants in this case (as opposed merely to "people" in general "who were guilty" and on whose behalf attorneys "look[ed] for an acquittal") were guilty of the charges against them. We recognize the concerns implicated by such arguments as set forth by the Supreme Court:

---

[12](...continued)
to us at our request of the District Attorney's Office.

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18-19 (1985).

While the prosecutor's comments here were facially responsive to the closing argument of one of the other defendants concerning the search for truth (although the spirit of them was perhaps motivated more by the disparaging comment of Attorney Greene that she lacked "a functional north on her compass"), they cannot be excused on that basis; they were certainly objectionable. They must, however, be considered in the context of her entire closing argument and the entire trial. *See Darden v. Wainwright*, 477 U.S. 168, 179 (1986). When we weigh the severity of the misconduct by the prosecutor against the court's instruction to the jury that the defendants were presumed innocent, and factoring in the weight of the evidence against Waddy, *see Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001), we agree with the Superior Court that this statement by the prosecutor did not "so infect[] the entire trial as to make the resulting conviction a violation of due process." *Darden*, 477 U.S. at 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). *See Commonwealth v. Waddy*, No. 3196 EDA 2005 at 9 (Pa. Super. Ct. Feb. 8, 2007) (finding that statement did not have "an adverse effect on the outcome of the proceedings"). In light of this conclusion, the Superior Court's conclusion under *Strickland* — that counsel did not perform deficiently in failing to object to the closing or to raise on appeal an issue concerning these remarks

— is not unreasonable.[13]   Accordingly, we do not recommend habeas relief as to this aspect of Petitioner's second claim for relief.

### 3.    Second comment to which objection was not made (vouching for Taylor)

Petitioner also contended before the Superior Court on PCRA review that his attorney should have objected to a comment made by the prosecutor in her closing regarding the prison time that a prosecution witness would face upon sentencing for his role in this conspiracy.  *See Commonwealth v. Waddy*, No. 3196 EDA 2005 at 5 (Pa. Super. Ct. Feb. 8, 2007) (identifying the statements petitioner pointed to as "improper comments" to which counsel did not object).  As did the Superior Court, we consider the context of the complained-of comment.

James Taylor, the co-conspirator who had formerly been employed at the Dollar Express store and who had pleaded guilty to charges of third-degree murder and robbery, testified on behalf of the Commonwealth at the trial of the remaining three conspirators.  As to Taylor's testimony, Attorney Greene argued on behalf of Waddy:

> Why would [Taylor] consistently furnish these lies and these prevarications in this courtroom[?][14]  You know and I know there's nothing arcane or mysterious about it.   He entered into a memorandum of agreement with the District Attorney's Office, and what was the deal, he pleaded guilty to two charges of third degree murder, he pleaded guilty to two charges of robbery, and there was a total of fifty-five to 110 years, I believe they're the figures, that he

---

[13] We are also mindful of the fact that the *Strickland* standard requires deference to the presumed strategic decisions of counsel.  We note that an objection during the closing argument would perhaps have drawn only additional attention to the comments with little further benefit to be had from a curative instruction given then, as a declaration of mistrial would have been unlikely.

[14] Attorney Greene, the third of the three defense lawyers to give a closing argument, had just proceeded to highlight certain inconsistencies between Taylor's trial testimony and both statements given to police and testimony given at a preliminary hearing concerning the plan to rob the store when it was occupied and the persons involved in that plan.  (*See* N.T. 11/1/01 at 13-34.)

was looking at.

> But by cooperating with the District Attorney's Office and providing information and testifying favorably for the District Attorney's Office what do you think is going to happen when he goes back in front of Judge Hughes prior to the sentencing don't you think, don't you think, that the purpose of that is for Mr. Taylor to get less, substantially less than fifty-five to 110 years in prison. That's what [it's] all about. That's what you have to think about, that's part of your assessing and that's part of your evaluation and that's part of your analysis when you go into that little room to deliberate.

*Commonwealth v. Waddy*, No. 3196 EDA 2005 at 10 (Pa. Super. Ct. Feb. 8, 2007) (quoting N.T. 11/1/01 at 34-36 and making alterations) (footnote added). In response, the prosecutor reminded the jury that Taylor "didn't just plead guilty to robbery, he entered a guilty plea to two counts of third degree murder, because he was responsible as an accomplice and a co-conspirator for those deaths." *Id.* (quoting N.T. 11/1/01 at 72). ADA Rubino also reminded the jury that, pursuant to the terms of Taylor's plea agreement, the District Attorney's Office would make no recommendation regarding his sentence and that the sentence "will be strictly up to Judge Hughes." *Id.* at 10-11 (quoting N.T. 11/1/01 at 72). She then put forth the following argument:

> You haven't seen Judge Hughes in this courtroom, ladies and gentlemen, have you? James Taylor will not get any different sentence from Judge Hughes because of one word that he says versus another word in this trial. He has agreed to testify, he testified. Judge Hughes isn't going to comb the notes of testimony to see what he said on direct versus what he said on cross-examination.
>
> And he knows that he can get up to fifty-five to 110 years in jail and there are mandatory sentences that are involved.
>
> So James Taylor, I can assure you ladies and gentlemen, is not going to walk out in two years, in five years, in ten years. James Taylor will be in jail until he is an old man, and he will not be out there doing drugs or anything else. He won't be robbing people either.

28

> And I would indicate one other thing to you about James Taylor.  You know he's not exactly your average hardened criminal.  He has a conviction for a simple assault and he had one open theft case, and that is his entire criminal record.
>
> He did a lot of drugs but he has never been charged with selling them, he uses them and he hasn't even been charged with that.

*Id.* at 11 (quoting N.T. 11/1/01 at 72-74).  Petitioner contended on PCRA review that this argument — concerning the possible sentence Taylor faced, his lack of significant criminal history and what Petitioner characterized as the prosecutor's excuses for Taylor's criminal acts — constituted improper vouching for Taylor's credibility.  *Id.* at 11 (quoting Appellant's Brief at page 21).  The PCRA court found that the prosecutor's recitation of Taylor's involvement in this case and his criminal history "hardly rises to the level of vouching for a witness's credibility," *Commonwealth v. Waddy*, No. 0005-0781 1/2 at 5 (Phila. Ct. Comm. Pl. Mar. 29, 2006), and the Superior Court agreed with that conclusion.  *Commonwealth v. Waddy*, No. 3196 EDA 2005 at 11-12 (Pa. Super. Ct. Feb. 8, 2007).

Again, we are sensitive to concerns about vouching.  *See United States v. Young*, 470 U.S. 1, 18-19 (1985) (identifying danger of conveying impression "that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant" and noting that opinion of prosecutor "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence").  Regardless of our assessment of whether this, in fact, constituted improper vouching, however, we have the benefit of the view of the trial judge, in his opinion on PCRA review, that this did not constitute vouching.  In light of that finding, we believe it was highly unlikely that Judge Geroff would have sustained any objection made by counsel to this argument at the time it was made and either granted a mistrial or given some

sort of curative instruction.  Moreover, even if this argument were deemed to have been improper vouching and counsel's failure to object could be deemed deficient performance, we cannot say that the prosecutor's comments in this regard so infected the entire trial such that the deficient performance in failing to object or pursue the issue on appeal actually prejudiced Petitioner.  In light of these findings, the Superior Court's adjudication of this aspect of Petitioner's *Strickland* claim was not unreasonable.

Even taken in the aggregate, we do not find that a mistrial would have been warranted nor the conviction reversed on appeal had defense counsel objected to the aspects of the prosecutor's arguments about which Waddy complained in the Superior Court on PCRA review and about which we presume him to be complaining here.  *Strickland* requires that a petitioner demonstrate both that counsel performed deficiently and that he was prejudiced as a result.  The state court's finding that Waddy did not do so with respect to counsel's response (or lack thereof) to the prosecutor's closing argument was not unreasonable.  Therefore, we believe that Petitioner's second ground does not provide an appropriate basis for habeas relief.

### C.    Ground Three: Ineffectiveness in Abandoning Issue of Court's Failure to Give Charge Regarding Prosecutor's Improper Comment

Petitioner's final claim for relief concerns the alleged denial of effective assistance of counsel.  He asserts that "[t]rial counsel[,] who also served as appellate counsel[,] abandoned the issue that the trial court erred by not giving a charge related to an improper comment made by the prosecutor."  (Pet. at 9, ¶ 12.C.)[15]  Respondents contend that the Superior Court's decision — that

---

[15]  Again, in the absence of any further explanation from Petitioner about the specific comment that was improper and what charge the court should have given (or what specifically his counsel should have done with respect to a request for such a charge), Respondents presume that
(continued...)

the comments about which Petitioner complains were not improper and that the trial court provided

adequate instructions on the issue with which Petitioner was concerned — did not constitute an

unreasonable application of federal constitutional law.  (Ans. at 27-29.)

    With respect to this issue, Waddy contended in the Superior Court that his trial counsel was

ineffective for abandoning an issue of trial court error stemming from the failure to give a jury

instruction.  In light of the prosecutor's comments in her closing concerning "the search for truth,"

Attorney Greene had requested that the court advise jurors that: "'It must be remembered that the

prosecution has just as great an obligation to discover the truth and assist the court in reaching a just

result as it has the duty to seek and obtain convictions.'"  *Commonwealth v. Waddy*, No. 3196 EDA

2005 at 12 (Pa. Super. Ct. Feb. 8, 2007) (quoting N.T. 11/1/01 at 103).  The trial court denied the

request, commenting, "'I don't see why I have to charge the jury on that.'" *Id.* (quoting N.T. 11/1/01

at 103.)  Waddy contended before the Superior Court that the failure of the jury to have received

such an instruction resulted in an inference that Waddy was not presumed to be innocent.  *Id.* at 13.

The Superior Court disagreed, based on its finding that the remarks concerning a trial not being a

"search for truth" did not constitute misconduct and based on its deference to the trial court as to

how precisely to fashion its jury instructions.  *Id.*  The Superior Court noted that the jury was advised

of the defendants' presumption of innocence both in the court's opening instructions given on

October 23, 2001 and during the closing instructions following the prosecutor's closing argument.

*Id.* at 13-14 (quoting N.T. 10/23/01 at 14-15 & N.T. 11/1/01 at 108-09).  The court found these

---

[15](...continued)
Waddy is raising here the same issue he developed in the Superior Court on PCRA review.  (*See* Ans. at 27.)  Given that Petitioner has not objected to this characterization, and given that a claim based on any other aspect of counsel's performance would be procedurally defaulted, we will do likewise.

instructions adequate and, therefore, that it did not abuse its discretion in not giving the requested instruction.  As a result, "direct appeal counsel cannot be considered ineffective for failure to pursue a meritless claim with respect to the denied jury instruction."  *Id.* at 14.

We agree that the instructions that the trial court gave concerning the presumption of innocence were sufficient to address any concerns raised by the prosecutor's comments in her closing that might have suggested that she believed the defendants in this case to be guilty, which was recognized as improper in *United States v. Young*, 470 U.S. 1, 18-19 (1985) and earlier cases.  The proposed instruction, while not an inaccurate statement, bore little relation to the notion of a presumption of innocence and instead would have just served as another volley in a war for ownership of a phrase — the search for, or discovery of, truth — that had already been fraught with needless peril.  The requested instruction did not reflect a piece of law on which the jury required instruction in order to fairly judge the case before it.  The fact that Attorney Greene "abandoned" any issue concerning the trial court's refusal to give this proposed instruction did not constitute deficient performance.  We see nothing unreasonable in the state court's rejection of this *Strickland* claim. Therefore, we do not believe habeas relief is warranted as to this final claim.

## IV.   CONCLUSION

Given the short and plain statement of his habeas claims in the form petition and his *pro se* status, we have endeavored to give Waddy a generous reading of both his petition and the state court record.  We conclude, however, that he has not met his burden to demonstrate an entitlement to habeas relief in that he has not demonstrated that the state courts' rejection, on direct appeal and PCRA review, of the claims he raises here could be deemed an unreasonable application of either the Fourteenth Amendment Equal Protection Clause (as set forth in *Batson* and its progeny) or the

32

Sixth Amendment right to counsel (as set forth in *Strickland* and its progeny).

Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, the district judge is required to make a determination as to whether a certificate of appealability ("COA") should issue. A COA should not issue unless the petitioner demonstrates that jurists of reason would find it to be debatable whether the petition states a valid claim for the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons set forth above, we do not believe a reasonable jurist would find the Court to have erred in denying the present petition. Accordingly, we do not believe a COA should issue.

Our Recommendation follows.

## **RECOMMENDATION**

**AND NOW**, this    29th    day of October, 2008, it is respectfully **RECOMMENDED** that the petition for a writ of habeas corpus be **DENIED** and that a certificate of appealability should **NOT ISSUE**, as we do not believe that Petitioner has made a substantial showing of the denial of a constitutional right.

Petitioner may file objections to this Report and Recommendation. *See* Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

BY THE COURT:


 /s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE